US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Western District of Arkansas
Fayetteville Division

FEB 2 1 2018

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| PREMISES LOCATED AT 3403 NORTHWEST ) | Case No. 5:18CM___25_____ |
| AVENUE BENTONVILLE, ARKANSAS; TWO ) | |
| CELLULAR PHONES, A MACBOOK LAPTOP, ) | |
| AND AN IPAD TABLET COMPUTER ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location)*: **Premises located at 3403 Northwest Edgewood Avenue, Bentonville, Arkansas, two cellular phones, a MacBook laptop, and an iPad tablet computer more particularly described in Attachment "A".**

located in the Western District of Arkansas, there is now concealed *(identify the person or describe the property to be seized)*: **See Attachments "B" and "C".**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ✓ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ✓ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Use of an Interstate Commerce Facility in the Commission of Murder for Hire |
| 18 U.S.C. § 1513 | Retaliating or Attempting to Retaliate, Against a Witness or Informant |

The application is based on these facts:

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Timmy K. Akins, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  February 21, 2018

_____
*Judge's signature*

City and state:  Fayetteville, Arkansas

Erin L. Wiedemann, United States Magistrate Judge
*Printed name and title*

## **AFFIDAVIT IN SUPPORT OF AN APPLICATION**
## **UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Timmy Akins, being duly sworn, depose and state the following:

### **INTRODUCTION**

1.      I make this Affidavit in support of an Application for a search warrant authorizing the search of the premises located at 3403 Northwest Edgewood Avenue, Bentonville, Arkansas, and occupied by MILTON "RUSTY" CRANFORD (hereinafter referred to as "CRANFORD") on February 21, 2018, more particularly described in Attachment "A," and hereinafter referred to as the "TARGET ADDRESS", and the search of two cellular phones and a MacBook laptop, hereinafter referred to jointly as the "TARGET DEVICES", see Attachment "C", for evidence of violations of 18 U.S.C. § 1958, Using Interstate Commerce Facilities in the Commission of Murder-For-Hire, and retaliating, or attempting to retaliate, against a witness or informant, in violation of 18 U.S.C. § 1513, hereinafter referred to jointly as the "TARGET OFFENSES", see Attachment "B". The TARGET ADDRESS and TARGET DEVICES are located in the Fayetteville Division of the Western District of Arkansas.

2.      I have been employed as a Special Agent of the Federal Bureau of Investigation (FBI) for more than twenty-two years. I am currently assigned to the Little Rock Division, Fort Smith Resident Agency, of the FBI. I am an Investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of and make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      During my tenure as a Special Agent with the FBI, I have received training to investigate "white collar" or economic crimes that require an analysis of business and financial transactions and records. I have participated in the execution of numerous search warrants during my career as an FBI Special Agent. I have seized evidence during the execution of search warrants that reveal the use of computers and interstate wire communications, such as emails, text messages and wire transfers between federally-insured financial institutions, to commit schemes to defraud others of money or property through material false and fraudulent pretenses, representations and promises.

4.      In connection with my official duties, I am charged with investigating violations of federal criminal laws. My involvement in federal investigations includes, among other things, debriefing defendants, sources, and informants; conducting surveillance and undercover operations; executing search warrants; monitoring Title III wiretaps; and analyzing documentary and physical evidence.

5.      This Affidavit contains portions of consensually-recorded telephonic and in-person conversations. To the extent that intercepted and recorded communications are summarized below, those summaries do not include references to all of the topics covered during the course of the conversation that was intercepted/recorded. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described. Where conversations are quoted, these are preliminary quotations based on careful review of the recordings, and may be modified upon further review with enhanced listening equipment. Additionally, the identities of speakers in these conversations are based on a combination of several factors, including subscriber information relating to the telephone numbers used, review of other intercepted phone calls where callers identify themselves, and through voice identification based on in-person conversations or known recordings of these same individuals through the use

of cooperating sources, and surveillance to identify these individuals. Additionally, within these conversations, I have added my understanding and/or interpretation of the language used, which is based on my training and experience and on the experience of other agents.

6.     The information contained in this Affidavit is based on investigations conducted by the FBI. The facts set forth in this Affidavit have either been observed directly by your Affiant or related to your Affiant by assisting law enforcement, other law enforcement officers, and witnesses as described herein. Since this Affidavit is submitted only for the limited purpose of securing a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I have not set forth each and every fact known to me concerning this investigation. I have included what I believe are the facts sufficient to establish probable cause for the search warrant and orders sought.

7.     Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by individuals who arrange to murder or harm witnesses in federal investigations. I am further aware of the methods employed by sophisticated defendants in federal cases to thwart any investigation of their illegal activities. My training and experience as a law enforcement officer, and my conversations with state, federal, and law enforcement officers in other countries form the basis of the opinions and conclusions set forth below. This Affidavit is intended to show only that there exists sufficient probable cause for the requested warrant, and does not set forth all of my knowledge about this matter.

## PROPERTY TO BE SEARCHED & ITEMS TO BE SEIZED

8.     The property to be searched is a single family-residence located at 3403 Northwest Edgewood Avenue, Bentonville, Arkansas, which is more particularly described in Attachment A.

9.     The items to be seized are more particularly described in Attachment B, and include instrumentalities and records related to the TARGET OFFENSES.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

10.     The devices to be searched (TARGET DEVICES) are as follows:

  a.  The second cellular phone seized from CRANFORD incident to arrest on February 21, 2018, which he identified as belonging to and used by him, and is currently in the possession of law enforcement;

  b.  A cellular phone located on the kitchen counter of the TARGET ADDRESS, on February 21, 2018;

  c.  A MacBook laptop located on the kitchen counter of the TARGET ADDRESS on February 21, 2018; and

  d.  An iPad tablet computer located on the dining room table of the TARGET ADDRESS on February 21, 2018.

11.     The electronically stored evidence sought is described more particularly in "Attachment C" to this Affidavit.

12.     The applied-for warrant would authorize the search of the TARGET ADDRESS, and the forensic examination of the TARGET DEVICES for the purpose of identifying and seizing evidence of violations of federal law, namely violations of 18 U.S.C. § 1958, Using Interstate Commerce Facilities in the Commission of Murder-For-Hire, and retaliating, or attempting to retaliate, against a witness or informant, in violation of 18 U.S.C. § 1513.

## TECHNICAL TERMS

13.     I use the following technical terms to convey the following meanings:

  a.   **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer

a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play back audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

## INFORMATION REGARDING THE USE OF WIRELESS TELEPHONES AND COMPUTERS IN CRIMINAL ACTIVITY

14. Based upon your Affiant's training, experience, and participation in this investigation and other investigations, as well as the knowledge and experience of other agents and police officers with whom your Affiant has worked, your Affiant knows:

a. That it is common for those seeking to solicit and hire individuals to harm witnesses and cooperating defendants (hereinafter referred to as "solicitors") to maintain records relating to the collection, transfer and expenditure of payments therefor or proceeds thereof. That the aforementioned financial records are maintained where the solicitors have ready control over them, including their residences, businesses, vehicles, storage units and/or other locations over which they maintain dominion and control.

b.      That these individuals often utilize electronic equipment, such as wireless telephones and computers to record and/or store the information described in the preceding paragraph.

c.      That these individuals commonly maintain electronic equipment, such as wireless telephones and computers, which contains the names, telephone numbers, addresses and/or electronic email addresses of individuals who would be inclined to accept an offer to harm or eliminate a witness or cooperating defendant.

e.      That these individuals often travel, or pay and arrange for others to travel, in furtherance of these activities, including traveling to transport weapons and to transport currency derived from and/or related to these activities. That people who solicit violence who travel, or who contract others to travel on their behalf, often communicate with others prior to, during and after their travel to confirm meeting places and that none have been compromised by law enforcement. These individuals leave records of these communications in various places. Including, but not limited to, their wireless telephones, computers, text messaging devices, telephone answering machines, and handwritten notes. These communication records are commonly found in the solicitor's residence, or other locations over which they maintain dominion or control.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15.     Based on my knowledge, training, and experience, I know that electronic devices, such as wireless telephones and computers, can and often do store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

16.     Devices that are able to access the internet have all of the capabilities of conducting financial transactions, and those financial transactions may be evidenced by electronic communications or receipts that are contained on the phone. Additionally, devices capable of accessing the internet, through their geolocation technology and applications, may have evidence relating to their owner's travel. Devices that are able to access the internet may also contain the results of search queries from the internet that relate to location, cooperation, and travel of our victim in the murder for hire investigation.

17. *Forensic evidence.* As further described in Attachment C, this Application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the Warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. How the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

18. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the Warrant I am applying for would permit the examination of the devices consistent with the Warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the Warrant.

## PROBABLE CAUSE

19.     This Affidavit is based on, in part, information provided by a Confidential Human Source (CHS) of the FBI. The conversations described herein are not intended to be exact transcripts, but are intended to accurately summarize the nature of the communications between the persons identified.

20.     On or about December 18, 2017, CHS, acting on CHS's own volition and not at the direction of the FBI, contacted CRANFORD at 903-826-0692. During this phone call that was not recorded, CRANFORD and CHS discussed what was going on in their personal lives as they had not spoken in several years. Your Affiant has been advised by CHS, that CHS has known CRANFORD personally for many years. During the phone conversation, CRANFORD told CHS he had "something real good" and CHS "would like it." CHS and CRANFORD arranged to meet at CHS's residence on or about December 27, 2017. Following this phone conversation, CHS contacted the FBI.

21.     Your Affiant notes CHS has a criminal history which includes acts of violence such as robberies and shootings, and has served time in prison for said acts.[1] Further, CHS is known to have provided reliable information to the FBI from approximately 2002-2011. Based on the criminal history records I have reviewed, the CHS has not been convicted of any offense since providing reliable information to the FBI. CHS believes CRANFORD is well aware of CHS's criminal history as CRANFORD's father used to "snitch" on CHS, and CRANFORD has previously discussed CHS's criminal past with CHS. CHS advised your Affiant that CHS has not engaged in any criminal acts with CRANFORD in the past.

---

[1] Following a review of CHS's criminal history, it appears CHS may have prior convictions for Aggravated Robbery, Resisting Arrest, Assault, Aggravated Battery with a Dangerous Weapon, and Selling Alcohol to a Minor. Moreover, it further appears from CHS's criminal history that he may have been previously arrested or under suspicion for other crimes, including, but no limited to, homicide and Assault with Intent to Kill.

22.     On or about December 27, 2017, when CRANFORD did not show up at CHS's residence, CHS called CRANFORD.  CRANFORD sounded sick, and CRANFORD told CHS he was talking about meeting with CHS the following Wednesday, January 3, 2018.  During this phone conversation, which was not consensually recorded, CHS stated that CRANFORD did not want to discuss the details of what he wanted to talk to CHS about using the telephone, however stated several times that CHS "would like it."

23.     On or about January 2, 2018, CHS received a call from CRANFORD.  CHS advised your Affiant that during this phone conversation, which was not recorded, CRANFORD indicated he wanted CHS to do something for him (CRANFORD), and CHS would make a lot of money.  Further, CHS asked CRANFORD if CHS would need a "piece," referring to a gun, and CRANFORD stated something to the effect, "I have one for you."

24.     Between the dates of December 18, 2017 and January 9, 2018, CRANFORD arranged a meeting with CHS at CHS's residence.  On the afternoon of January 9, 2018, CRANFORD met with CHS at CHS's residence, along with CRANFORD's son, CHASE CRANFORD (CHASE).  During this meeting, which was consensually recorded, CRANFORD told CHS about an ex-business partner of CRANFORD's, DON JONES, who recently pleaded guilty and was cooperating against CRANFORD and others in a federal criminal investigation.  Your Affiant is aware that JONES has in fact pleaded guilty and is cooperating with the government in the Western District of Missouri against CRANFORD as stated to the CHS by CRANFORD.

25.     According to a review of the consensually monitored recording, CRANFORD and the CHS engaged in the following colloquy regarding JONES:

CHS:                          What's this son-a-b*tch? That's goin uh..

R CRANFORD:            This son-a-b*tch out of Philadelphia, he pled guilty in Missouri.

| | |
|---|---|
| CHS: | Your partner. |
| R CRANFORD: | Pled guilty in Missouri. |
| CHS: | So, does he have anything on you? |
| R CRANFORD: | It's hearsay. It's what he-he's trying to tell. |
| CHS: | Well that's what I'm saying though. |
| R CRANFORD: | He's telling the feds that he does. |
| CHS: | Can he pin you down, I mean? What I'm trying to ask you. |
| R CRANFORD: | I don't know. |
| CHS: | What do you mean you don't know? |
| R CRANFORD: | I don't know, shit if I said anything... |
| CHS: | Other words, you're saying you probably done more than the f*ck then you're supposed to do and you're worried about it. Jesus Christ, Rusty. |
| R CRANFORD: | I mean |
| CHS: | What uh? |
| R CRANFORD: | This motherf*cker right here. |
| CHS: | Where's he at? |
| R CRANFORD: | He's in Philadelphia. He's in South Jersey. (Whispered) He needs to go away.  He needs to be gone. |
| CHS: | Well what do you wanna do? |
| R CRANFORD: | Just that. I mean this son of a b*tch, boy... |
| CHS: | Well. |
| R CRANFORD: | ...He's a bad news. |

26.     CRANFORD told CHS, when referring to JONES, "he needs to go...he needs to

be gone." While making this statement to CHS, CHS advised that CRANFORD used his hand to

make a gun shooting gesture. CHS, believing that CRANFORD was meaning he (CRANFORD)

wanted CHS to kill JONES, engaged in the following discussion with CRANFORD about whether

CRANFORD had told anyone else about this request:

| | |
|---|---|
| CHS: | Have you-have, have you talked to anybody about? |
| R CRANFORD: | No, not a word. I've sealed my fate to myself. |
| CHS: | I mean you ain't said nothing about to anybody about... |
| R CRANFORD: | Nothing. |
| CHS: | ...doin' away with this guy? |
| R CRANFORD: | No. I know nothin'. |
| CHS: | Don't-don't do that, because you know, you'll get. |
| R CRANFORD: | I know nothin'. I mean, this son-a-b\*tch, he flew to my house last year in South Florida. He flew to my house in South Florida and it's like, uh, geesh, you know, so. |
| CHS: | Did he talk to you about it, or what? |
| R CRANFORD: | He started talking about different stuff and I-I, this is before all this come out. |
| CHS: | Oh, it was before it come out? |
| R CRANFORD: | Yeah. So, but I ain't done nothin' wrong with this guy. I mean, I don't know where-he needs to do away with, with, with, he needs to do away with the fact that he's trying to say that he knows something about me, because he don't know nothin' about me. Cause I've never done anything against the law with him, ever. Never. And he needs to do away with that. And he does. |
| CHS: | Well you think that-he, he's going to misrepresent something... |
| R CRANFORD: | I think, Yes. |
| CHS: | ...And get you indicted? |
| R CRANFORD: | That-that-that's my thing. I think that he's going to lie to try to help his self. You know why? Cause it's kinda like this, one thing that I do believe: I think that anybody can tape record you and then can play bits and pieces, anything they want and they can splice it together and they can do anything they want to do. |
| CHS: | Yeah, yeah. |
| R CRANFORD: | Over a period of conversations, well they can do their own little technology and put it all together, where it makes it sound like you're saying something that you really didn't say. |
| CHS: | Well they'd have to have-they'd have to have some kinda facts somewhere to indict you, I think. |

27.    CRANFORD then discussed with the CHS an individual that he assisted in getting

out of prison for a murder in Fouke, Arkansas:

| | |
|---|---|
| R CRANFORD: | ...because I mean, truthfully, I got a motherf*cker that killed somebody named Eddie Burgess – just got him out of prison. |
| CHS: | Eddie Burgess? |
| R CRANFORD: | Last year. He killed a boy in Fouke, Arkansas. |
| CHS: | I heard that name somewhere before. |
| R CRANFORD: | Yeah, killed him. |
| CHS: | When – when was this? |
| R CRANFORD: | About sev-six years ago. |
| CHS: | I mean when did he kill somebody? |
| R CRANFORD: | About seven years ago, and I got him out of prison two years ago. |
| CHS: | I think I read it in the paper somewhere. |
| R CRANFORD: | Yeah, he wrapped him up in a... |
| CHS: | We've been here se-goin' on seven years, so. |
| R CRANFORD: | Yeah, well he-they wrapped up in the paper and uh, he wrapped him up in a uh, in a uh, shit, rug and threw him in Mercer Bayou down there in Fouke. They sent him to prison and uh, I got him out two, two years ago. So, those comments have been made and... |
| CHS: | What's he to you? Eddie Burgess? |
| R CRANFORD: | Oh nothin'. I tore up with him. I went to high school with him. That's how he knew me. So that's why his daddy and them hired me. So, those comments have been made – that there's no way that he could have- |
| CHS: | Done anything. |
| R CRANFORD: | ...accomplished all this shit without being dirty. |
| CHS: | (coughing) |
| R CRANFORD: | Well f*ck that. Show me where I'm dirty. I mean, yeah, have I wrote a hell of a lot of-have I paid a hell of a lot of politicians? I sure have over the years. A shit load of money. |
| CHS: | Umm-hmm |

| R CRANFORD: | But I've wrote them all checks, so there's paper trail of everything I wrote. |
|---|---|
| CHS: | Umm-hmm. |
| R CRANFORD: | If motherf*ckers tryin' to buy somebody, they ain't going to write 'em a check for it. |

28.     CRANFORD and the CHS then discussed where JONES currently lives:

| R CRANFORD: | Oh, yeah. He lives in South Jersey. So uh, so lady in Dallas |
|---|---|
| CHS: | But what happens if somebody, if somethin' happens to him? |
| R CRANFORD: | Oh, I don't know. |
| CHS: | I mean, they gonna to look at you, what? |
| R CRANFORD: | So, there's no tellin'. |

29.     CRANFORD related to the CHS a story about a powerful woman in Dallas who had beaten corruption charges but lost everything in the process of defending herself and stated to the CHS more details about JONES and his pending case:

| R CRANFORD: | Sh-yeah, so, so the uh, so anyway, the uh, I mean I think about her, shit that she had and then this son-a-b*tch turns around and pleads guilty and I'm thinking f*ck. |
|---|---|
| CHS: | We need to talk outside. |
| R CRANFORD: | You know and I'm wondering if he rolled on her. |
| CHS: | Awh, you know, you never know, see, the uh, I mean… |
| R CRANFORD: | Who knows. So… |
| CHS: | So she didn't give up anybody? |
| R CRANFORD: | Nope. No. Nobody. And Brady, Congressman, he pled guilty. |
| CHS: | Yeah, I read that. |
| R CRANFORD: | Now his other partner, he's got a partner by hisself, too. He pled not guilty and Brady pled not guilty. Well see that's the same thing in Arkansas, they got a couple Senators that's already pled guilty. F*ck Arkansas', man they puttin' the hammer on probably 20 people up there. But their words to my attorney was, he, talkin' about me. |
| CHS: | Mhm. |

| | |
|---|---|
| R CRANFORD: | He holds the keys to the kingdom. That was the words they used. |
| CHS: | That you did. |
| R CRANFORD: | That I hold the keys to the kingdom. |
| CHS: | And he... |
| R CRANFORD: | But they're talkin' about the kingdom being Capitol Hill. That was their term. And I looked at my attorney and said they givin' me a lot of motherf*cking credit, is all I can tell you, because I ain't near that strong. They give me a lot of, they give me credit, I don't want. And I mean really, if you google my name, that's why I ask you the other day, did y'all have internet. If you google my name, Milton Cranford... |
| CHS: | Oh I could have done that, yeah. |
| R CRANFORD: | That's what I'm saying, if you google that, I'm in the f*cking paper every other week. But it's always northwest Arkansas, see? North-the Ark-northwest Arkansas version of the Arkansas Democrat? |
| CHS: | Umm-hmm |
| R CRANFORD: | That's the reason down here a lot of people don't realize it. Cuz see, northwest Arkansas, up in Rogers, they got a-there's a different version of the Arkansas Democrat. Well a lot of times, you can google Arkansas Online so, I mean, shit, I really thought that I was gonna, that 2016/17 was gonna end the year with me being one of the top three stories in the state of Arkansas – that's how f*cking much publicity I don't want, I've got. |

30.     At the end of the meeting on January 9, 2018, CRANFORD handed the CHS five

(5) $100.00 bills, while indicating he would return to CHS's residence on January 12, 2018, to

further discuss the details that CRANFORD did not want to discuss in front of his son. The CHS

told Cranford:

| | |
|---|---|
| R CRANFORD: | (you can hear what sounds like the flipping of cash) Let's talk Friday. (whispered) |
| CHS: | Alright. |
| R CRANFORD: | I just assume, not. I didn't know Chase was coming, but I didn't want tell anybody |
| R CRANFORD: | That's why I said, you know, I didn't want to talk anything in front of him. |

| CHS: | But I didn't want to tell him that. |
|---|---|
| CHASE: | Hey dad, I'll be in the car. |
| CHS: | If we're going to talk that business, brother, we've gotta, I don't want. |
| R CRANFORD: | I won't eit-Me neither. |
| CHS: | I don't want any-f*cking-body knowing sh*t. |
| R CRANFORD: | Well that's my thing. |
| CHS: | Sh*t. |
| R CRANFORD: | That-f*ck. |
| CHS: | I mean, I don't want him-them coming to you and you telling me-them anything about me |
| R CRANFORD: | Oh, exactly. That ain't happening. |
| CHS: | Cause anything that we say is going to be hearsay between us. |

31.    CRANFORD did not show up at the CHS's residence on January 12, 2018, nor did he answer any of several calls by the CHS between January 12, 2018 and January 19, 2018.

32.    On or about January 22, 2018, the CHS placed a consensually recorded call to CRANFORD, which he answered. During the call, CRANFORD told the CHS, "I'll probably be that way in about three weeks…'cause I got the babies till then."[2] The CHS then asked, "We gonna be able to talk some business?" Cranford answered, "Oh yeah, I'm coming by myself when I come." CRANFORD then began to explain the route he would travel, and the CHS asked, "You know where this guy lives, right?" CRANFORD answered, "Oh yeah, exactly. Heck yeah, I know everything."

33.    On telephone calls that occurred on or about 9th day of February, 2018, CRANFORD, according to cell tower records obtained by a 2703(d) Order authorized by United States Chief Magistrate Judge Barry Bryant, was physically located down in Southwest Arkansas,

---

[2] It is believed by your Affiant based on other calls and my conversations with the CHS, that CRANFORD was talking about having custody of his own children during this time-period.

Northern Louisiana, and North Eastern Texas. CRANFORD called the CHS and indicated that he would still like to meet with the CHS "sometime this week." However, those meetings never occurred.

34.     On February 21, 2018, CRANFORD was found in a single-family residence located at 3403 Northwest Edgewood Avenue, Bentonville, Arkansas (TARGET ADDRESS), and arrested on a Federal Arrest Warrant out of the Western District of Missouri. The only persons present in the TARGET ADDRESS were CRANFORD and two minor children.

35.     Incident to the arrest, law enforcement officers seized two cellular telephones that CRANFORD identified as belonging to him and used by him. Law enforcement had previously obtained a Federal Search Warrant (Case No. 5:18CM24) for one of the cellular phones seized, which CRANFORD had used communicate with the CHS. The other phone identified by CRANFORD is herein referred to as "the second cellular phone".

36.     On the dining room table officers observed a black backpack with a large amount of cash:



37.     CRANFORD volunteered that the visible cash was his, that it was legitimately earned, and that he had paid taxes on those earnings. CRANFORD also volunteered that the visible cash was approximately $14,000.00, and that there was additional cash in the bag that was not visible.[3]

38.     Officers also observed an iPad tablet computer located on the dining room table.

39.     CRANFORD was asked if there were any firearms in the residence, and CRANFORD advised that there was a recently purchased pistol on the top shelf of a closet in the master bedroom. Officers observed a Derringer-type pistol in the location identified by CRANFORD.

40.     Officers also observed a third cellular phone and a MacBook laptop located on the counter in the kitchen. CRANFORD provided the password to the MacBook laptop to law enforcement.

---

[3] According to the Investigation to date, CRANFORD had also frequented the Horseshoe Casino in Bossier City, Louisiana, on January 9, January 13, January 15 and February 8 through February 13, 2018. This information is supplied to the Court as a possible source of the cash at CRANFORD's disposal at the time of his arrest.

41.     Because of CRANFORD's presence in the residence alongside his minor children, the fact that he claimed the cash and pistol, and that he had access to the computer in the residence, it is clear that the residence listed in Attachment A was a place that CRANFORD had dominion and control over, and is therefore a likely repository of information relating to the matters under investigation.

## CONCLUSION

30.     Based on the above, I respectfully submit that this Affidavit supports probable cause for the attached Search Warrant authorizing the search of the TARGET ADDRESS for the items listed in Attachment B, and the examination of the TARGET DEVICES described in Attachment B, to seek the items listed in Attachment C.

Respectfully Submitted,

Special Agent Tim Akins
Federal Bureau of Investigation

Subscribed and sworn to before me on February 21, 2018.

Honorable Erin L. Wiedemann
United States Magistrate Judge

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

1. The property to be searched is a single family residence located at 3403 Northwest Edgewood Avenue, Bentonville, Arkansas, which is located in the Western District of Arkansas and depicted below.



2. Two Cellular phones

3. MacBook Laptop

4. iPad Tablet Computer

## **ATTACHMENT B**

### **DESCRIPTION OF ITEMS TO BE SEIZED**

There is probable cause to believe that the following items are located in the TARGET ADDRESS, which are evidence of violations of 18 U.S.C. § 1958, Using Interstate Commerce Facilities in the Commission of Murder-For-Hire, and retaliating, or attempting to retaliate, against a witness or informant, in violation of 18 U.S.C. § 1513:

1.    A backpack located on the dining room table containing United States currency identified by CRANFORD as belonging to him;

2.    United States currency;

3.    All bank records, checks, credit card bills, account information, and other financial records that may reveal funds gathered for the commission of the above-listed offenses, including records pertaining to CRANFORD's acquisition of the $500 paid to the CHS on or about January 9, 2018;

4.    Firearms, including a Derringer-type pistol located on a shelf in the closet of the master bedroom;

5.    Records related to ownership and acquisition of firearms;

6.    A cellular telephone located on the kitchen counter;

7.    A MacBook laptop computer located on the kitchen counter;

8.    An iPad tablet computer located on the dining room table;

9.    Records related to communications with the CHS;

10.    Records related to travel to meet with the CHS, including any information recording CRANFORD's schedule or travel from December 18, 2017 to the present; and

11.     Records related to information regarding the whereabouts of DON JONES and other persons associated with the underlying investigation in which DON JONES is a cooperating defendant.

## ATTACHMENT C

This warrant authorizes the forensic examination of a cellular telephone located on the kitchen counter at the TARGET ADDRESS, a MacBook laptop located on the kitchen counter at the TARGET ADRESS, an iPad tablet computer located on the dining room table of the TARGET ADDRESS, and the "second cellular phone" seized from CRANFORD incident to arrest on February 21, 2018, currently in the possession of law enforcement (TARGET DEVICES) for the purpose of identifying and seizing the following electronically stored information:

1.      All records and information on the TARGET DEVICES that relate in any way to violations of 18 U.S.C. § 1958, Using Interstate Commerce Facilities in the Commission of Murder-For-Hire, and retaliating, or attempting to retaliate, against a witness or informant, in violation of 18 U.S.C. § 1513 and/or others, including but not limited to:

   a. Records relating to travel related to the above-described offenses:

   b. Ownership and acquisition of firearms;

   c. Possession and acquisition of currency;

   d. Any electronic communication relating to the commission of the above-listed offenses;

   e. Types, amounts, and location of funds that may have been available to Cranford to pay for the commission of the above-listed offenses;

   f. Any information recording CRANFORD's schedule or travel from December 18, 2017 to the present;

   g. All bank records, checks, credit card bills, account information, and other financial records that may reveal funds gathered for the commission of the above-listed offenses;

   h. Photos and videos which tend to show the owner/user of the TARGET DEVICES, or which depict, money or other assets, or which identify criminal associates.

2.      Evidence of user attribution showing who used or owned the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.